**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:24-cr-316-SI |
| v. | **OPINION AND ORDER ON MOTION TO SUPPRESS EVIDENCE** |
| **FRANK ACOSTA-LOYA** and **BRIANDA CHAVEZ**, | |
| Defendants. | |

Bryan Chinwuba, Assistant United States Attorney, U.S. DEPARTMENT OF JUSTICE, U.S. ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Anna M. Belesiotis and Elizabeth G. Daily, Assistant Federal Public Defenders, FEDERAL PUBLIC DEFENDER'S OFFICE, 101 SW Main Street, Suite 1700, Portland, OR 97204. Of Attorneys for Defendant Frank Acosta-Loya.

Edie M. Rogoway, ROGOWAY LAW LLC, 521 SW Clay Street, Portland, OR 97201; and Lisa A. Maxfield, PACIFIC NORTHWEST LAW LLP, 1100 SW Sixth Avenue, Suite 1600, Portland, OR 97204. Of Attorneys for Defendant Brianda Chavez.

**Michael H. Simon, District Judge.**

Defendants Frank Acosta-Loya and Brianda Chavez move to suppress physical evidence

seized and statements made on August 1, 2024, when they were stopped by an Oregon State

Trooper while they were driving northbound on Interstate Highway 5 ("I-5"). Defendants argue

that the officer violated their Fourth and Fifth Amendment rights through his questioning and

warrantless seizure of two kilograms of fentanyl from the back seat of their car. Specifically, Defendants contend that the Oregon State Trooper performed an unlawful stop without reasonable suspicion of a traffic or criminal violation, unlawfully prolonged the stop to investigate drug trafficking without reasonable suspicion of a crime, interrogated Defendants without advising them of their *Miranda* rights, and elicited involuntary statements.

The government responds that the Trooper had reasonable suspicion to stop the car on two grounds: (1) his first-hand observation of the car committing traffic violations; and (2) a reasonable suspicion that the car was being used in drug trafficking. The government further argues that the Trooper had reasonable suspicion to extend the stop based on a combination of information the Trooper discovered about the car before the stop and observations he made during the stop, including the fact that neither occupant of the car had a valid driver's license. Finally, the government asserts that the Trooper had probable cause to search the car because a law enforcement K-9 dog alerted to the presence of narcotics in the car and because of the automobile exception to the search warrant requirement.

On August 14, 2025, the Court held an evidentiary hearing and received testimony from Oregon State Troopers Scott Show and Brian Smith. The Court also received in evidence exhibits submitted by the parties, including the Trooper's body-worn camera and dashboard camera ("dash-cam") video footage. Mr. Acosta-Loya filed his reply brief on September 5, 2025. The Court heard closing arguments on October 15, 2025. After considering the evidence and the arguments of the parties, the Court grants in part and denies in part Defendants' motions. For the reasons explained below, the Court suppresses Defendants' verbal statements made to the Trooper before being given *Miranda* warnings but declines to suppress the physical evidence, specifically the fentanyl, discovered in and seized from Defendants' car.

## STANDARDS

### A.  Fourth Amendment

The Fourth Amendment to the U.S. Constitution protects individuals from unreasonable searches and seizures by the government. U.S. Const. amend. IV. Searches conducted without prior approval by a judge or magistrate are deemed unreasonable per se, "'subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The government bears the burden of proving that a warrantless search or seizure falls within a recognized exception. *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012). One exception at issue here is the "automobile exception," which allows the government to "search an automobile without having obtained a warrant so long as they have probable cause to do so." *Collins v. Virginia*, 584 U.S. 586, 592 (2018).

A traffic stop may be considered a seizure under the Fourth Amendment. For a traffic stop to be reasonable, the law enforcement officer conducting or authorizing the seizure must show that there was reasonable suspicion to pull over the car. *See Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014). Further, an officer may not prolong the stop "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015).

When evidence is gathered in a search and seizure that violates the Fourth Amendment, the exclusionary rule generally prevents its use in a criminal trial brought against the victim of the unlawful search. *See Illinois v. Krull*, 480 U.S. 340, 347 (1987). In *Nix v. Williams*, however, the Supreme Court held that evidence obtained in violation of the Constitution could still be admitted at trial if the government could prove "by a preponderance of the evidence that the

information ultimately or inevitably would have been discovered by lawful means." 467 U.S. 431, 444 (1984).

## B.  Fifth Amendment

The Self-Incrimination Clause of the Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To effectuate this right, the government may not use a defendant's statements against him at trial if the defendant gave the statements involuntarily. *See United States v. Preston*, 751 F.3d 1008, 1015-16 (9th Cir. 2014). A statement is involuntary for purposes of the Fifth Amendment if it is the product of physical or psychological coercion. *Arizona v. Fulminante*, 499 U.S. 279, 287-88 (1991). The government has the burden of proving, by a preponderance of the evidence, that a defendant voluntarily made the statement at issue. *See United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004).

To protect a suspect's Fifth Amendment right against compulsory self-incrimination, law enforcement officials must advise suspects of their rights before questioning. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). The *Miranda* safeguards apply when a person is both in custody and subject to interrogation. *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980). Interrogation under *Miranda* is "express questioning or its functional equivalent." *Id.* at 300-301.

Although there is a presumption against waiver, defendants may waive their *Miranda* rights. *United States v. Bernard S.*, 795 F.2d 749, 751-52 (9th Cir. 1986). "For inculpatory statements made by a defendant during custodial interrogation to be admissible in evidence, the defendant's waiver of *Miranda* rights must be voluntary, knowing, and intelligent." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (quotation marks omitted). The prosecution must prove "by a preponderance of the evidence that a defendant knowingly and intelligently waived his *Miranda* rights." *Id.* To satisfy this burden, the government "must introduce sufficient

evidence to establish that under the totality of the circumstances, the defendant was aware of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quotation marks omitted). "The government's burden to make such a showing is great, and the court will indulge every reasonable presumption against waiver of fundamental constitutional rights." *Id.* at 537 (quotation marked omitted). One factor a court should consider "[i]n determining whether a defendant knowingly and intelligently waived his *Miranda* rights" is "any language difficulties encountered by the defendant during custodial interrogation." *Id.*

## BACKGROUND

On August 1, 2024, Defendants were driving northbound on I-5 from California. Late in the morning, while on patrol with his narcotics canine, Oregon State Senior Trooper Brian Smith observed a red, 2013 Kia (the "Kia") driving north on I-5. ECF 78 ("Hearing Tr.") at 12:21-24; 134: 13-14, 19-21. He witnessed the Kia slow down dramatically as it approached the location of his patrol car parked on the side of the highway; the Kia was traveling well under the speed limit. *Id.* at 134:21-135:8. Importantly, he also noted the numbering on the California license plate, which began with a 9, indicating, based on his experience, a relatively new license plate and registration. *Id.* at 12:21-24, 135:14-22.

Trooper Smith followed the Kia for a distance but did not observe any traffic violations. *Id.* at 136:2-4, 22-23. He then contacted Trooper Scott Show, whom he knew to be working a few miles north of his location, using the cellphone communication app Zello. Hearing Tr. at 11:7-18, 136:24-137:13. Trooper Smith alerted Trooper Show to the Kia, sharing what he knew about the car and noting that it was driving north on I-5 in an "unusual and somewhat suspicious" manner, but that "did not constitute a violation of Oregon vehicle code." ECF 52-1 ("Police Report") at 5. Trooper Show also recognized the California license plate as newly issued, understanding that detail—in relation to the older model of the Kia—to be a potential

indication of drug trafficking. Hearing Tr. 12:21-24, 21:4-22:16. In Trooper Show's experience, bulk narcotics traffickers changed cars often to complicate investigative efforts, frequently mounting new plates on old cars.[1] *Id*. at 21:13-22:16.

Trooper Show began traveling north on I-5 in search of the Kia, entering the freeway at milepost 234. *Id*. at 14:12-18. At about the same time, an analyst on Trooper Show's team who was also on the Zello channel ran the license plate through a DMV database, reporting over Zello that the Kia had been registered in Antioch, California four months earlier. *Id.* 15:15-18, 17:18-23. Trooper Show recognized Antioch as a municipality in the San Francisco Bay Area, which he knew was "a major source of bulk fentanyl," and again noted the recency of the registration in relation to the age of the Kia. *Id.* 15:15-21; Police Report at 5. The analyst then used a publicly available database to try to obtain a telephone number for the car's two registrants, Mr. Acosta-Loya and his wife, Ms. Chavez, and was able to obtain a telephone number associated with Ms. Chavez. Hearing Tr. 17:1-5, 17:24-18:5.[2] Next, the analyst entered that number into a law enforcement database, the Law Enforcement Data Systems ("LEDS"), which revealed that the

---

[1] Trooper Show indicated that his "threshold as an investigator is…six months. If a vehicle has been owned less than six months, then I pay attention to that vehicle, especially if it is an older vehicle." Hearing Tr. at 22:3-5.

[2] Trooper Show acknowledged that this database was not always accurate, but that it also included a "percentage of likelihood that the phone number is accurate." Hearing Tr. at 18:14-17. He further testified that his team had a standard practice of considering and relying on database information only when it cleared a threshold of reliability, describing such high-certainty information as "actionable." *Id.* at 20:1-17. That threshold was typically around 80 to 85 percent certainty of a phone number's accuracy but sometimes dipped as low as 60 percent. *Id.* As a result of this standard practice, Trooper Show's analyst generally only provided team members with phone numbers that cleared the threshold of reliability. *Id*. at 20:3-4. In this instance, Trooper Show did not recall whether the analyst provided him with the percentage of certainty for the phone number he found for Ms. Chavez, *id.* at 20:18-24, but trusted the information's actionability on the basis of this standard practice.

telephone number for Ms. Chavez was the target of an active U.S. Drug Enforcement

Administration ("DEA") investigation proceeding in Colorado. *Id.* 13:3-10.

    After traveling north on I-5 for about 25 minutes, Trooper Show located the Kia near

milepost 264. *Id.* at 14:18-20. When Trooper Show saw the Kia, he noted that it "was traveling

with the flow of traffic" in the left-hand lane of a 65 miles-per-hour zone, but that it slowed

down "substantially" when the driver appeared to notice Trooper Show's presence. Police Report

at 5; *see also* Hearing Tr. 27:7-14. Trooper Show's same-direction radar recorded the Kia's

resulting speed at 61 miles-per-hour, Police Report at 5, and Trooper Show observed at least two

or three cars backing up behind the Kia. Hearing Tr. 25:13-17, 26:10-14. This observation was

not recorded in dash-cam footage because the dash-cam had only a 60-second memory, meaning

that it would only store data beginning 60 seconds before the patrol car's emergency lights were

activated or when the recording was turned on manually. Hearing Tr. at 26:4-9, 29:10-20.

Neither condition had yet occurred. *Id.* The Kia eventually moved from the far lefthand lane to

the center lane. *Id.* at 28:20-21. Trooper Show was able to catch up to the Kia and confirm that

its license plate matched that of the car reported by Trooper Smith. *Id.* at 32:8-20. Shortly

thereafter, Trooper Show, using the Zello app, informed Trooper Smith that he had located the

Kia. *Id*. at 137:14-20. Understanding that Trooper Show's canine was not yet certified to detect

drugs and knowing that both he and Trooper Show were suspicious that the Kia was trafficking

narcotics, Trooper Smith informed Trooper Show that he would make his way to Trooper

Show's location. *Id*. at 137:22-138:4.

    From that point in the encounter, there is dash-cam footage available. The dash-cam

footage shows the Kia traveling in the center lane behind another vehicle. *See* ECF 67

("Dashcam Footage") at 12:00:18-12:01:22.[3] As Trooper Show approached the Kia, it appeared to be traveling at about 65 miles per hour, the speed limit on that section of I-5, based on the speed shown at the top of the dash-cam footage. *Id.* at 12:00:41-12:00:50. The Kia then began to slow down, with its slowest recorded speed at 61 miles per hour for about two seconds. *Id.* at 12:00:50-12:00:56 (travelling at 61 miles per hour from 12:00:54-12:00:56). The Kia then sped up slightly to about 64 miles per hour, *id.* at 12:01:00-12:01:07, at which point Trooper Show moved from the lefthand lane to behind the Kia in the center lane. Throughout the video, while the Kia was in the center lane, it maintained a constant distance from the vehicle in front of it. *See generally id.* at 12:00:18-12:01:21. Trooper Show then turned on his emergency lights, initiating a stop at about milepost 265. Dashcam Footage at 12:01:21; Police Report at 6. The Kia steered to the righthand shoulder and stopped. Dashcam Footage at 12:01:21-12:01:43.

Trooper Show approached the Kia on the passenger side. ECF 52-2 ("Bodycam Footage") at 12:01:49-12:01:57. Mr. Acosta-Loya was driving, and Ms. Chavez was in the passenger seat. Ms. Chavez had the car's documents and her Colorado identification card in her hands. *Id.* at 12:01:57-12:02:00. Trooper Show told Defendants that he had stopped them because he had "checked your speed at 61 when you're in the center lane and in the left-hand lane. The speed limit is 65, so if you're gonna be going slower than the speed limit, you gotta be in the right-hand lane." *Id.* at 12:02:00-12:02:15. Ms. Chavez informed Trooper Show that Mr. Acosta-Loya did not speak English. *Id.* at 12:03:51-12:03:55; Police Report at 6. Trooper Show noted that Mr. Acosta-Loya seemed "uncomfortably subservient." Police Report at 6; Hearing Tr. 98:16-20.

---

[3] All citations to times in ECF 67 ("Dashcam Footage") and ECF 52-2 ("Bodycam Footage") are to the timestamps in the bottom righthand corner of the videos.

Mr. Acosta-Loya provided a purported international driver's license from Mexico with an address of "Pittsburg 94656 United States." ECF 63-1; *see also* Police Report at 6. Trooper Show found the absence of a listed state to be strange for a government-issued document. Hearing Tr. at 37:23-38:3; 41:8-15. Additionally, he noticed that the document's lamination had not been applied to its edges, which he also found to be atypical of government-issued documents. *Id.* at 37:23; 40:2-5. Finally, he found it odd that Mr. Acosta-Loya had and relied upon an international driver's permit because Mexican driver's licenses alone are valid in Oregon. *Id.* at 40:23-41:3. The addition of the international driver's permit is not necessary if a person holds a valid driver's license from Mexico. But Mr. Acosta-Loya did not provide a Mexican driver's license, nor a valid license from California or any other jurisdiction. An international driver's permit alone, without a validly issued driver's license, does not grant a driver the "lawful privilege to drive on Oregon roadways." *See id.* at 39:17-19. Ms. Chavez displayed a Colorado "learner's permit." *Id.* at 43:10-14. A learner's permit, however, does not allow a person lawfully to drive in Oregon unless accompanied by someone with a valid driver's license. *Id.*

Trooper Show smelled a "strong odor of marijuana" coming from inside the Kia, and he asked if the two had traveled from California, to which Ms. Chavez said, "yes." *See* Police Report at 6; *see also* Hearing Tr. at 45:13-15. Trooper Show then returned to his patrol car to conduct LEDS/DMV checks and "initiate a warning for impeding traffic." Police Report at 6. At this point in the stop, Trooper Show "was suspicious that the driver and passenger were engaged in bulk narcotic smuggling and had imported non OLCC marijuana into the state of Oregon." *Id.*

Trooper Show returned to the Kia and asked Ms. Chavez if he could speak to her outside the Kia, and she consented. Bodycam Footage at 12:10:45-12:10:52. They spoke for about 12

minutes in the front seat of Trooper Show's patrol car. *Id.* at 12:11:18-12:23:03. In response to

Trooper Show's questioning, Ms. Chavez stated that she and Mr. Acosta-Loya were traveling

from Antioch and that they were driving slowly because they had already received two tickets

for speeding. *Id.* at 12:11:18-12:11:26, 12:12:01-12:12:09. Ms. Chavez told Trooper Show that

their only stops in Oregon had been at gas stations. *Id.* at 12:12:52-12:12:57. She also said that

there was a small amount of marijuana in the car, to which Trooper Show told Ms. Chavez, "It's

not that big of a deal, although I will need to verify the quantity of marijuana that's in your

vehicle, and the reason why is because it's—it is illegal to cross the—any state lines with any

amount." *Id.* at 12:12:59-12:13:25. Trooper Show told Ms. Chavez that he was "a little bit

suspicious" of Mr. Acosta-Loya's international driver's license, and asked her, "do you know if

that thing's fake?" *Id.* at 12:14:07-12:14:32. Ms. Chavez responded that it was "made legally."

*Id.* at 12:14:32-12:14:39.

Trooper Show then asked Ms. Chavez about her travel plans, and she responded that she

and Mr. Acosta-Loya were traveling to Portland for the day to pick up her little sister. *Id.*

at 12:13:31-12:13:50. Ms. Chavez stated that she did not know the precise address to which she

was traveling, but that they were going to call for directions when they got close to Portland. *Id.*

at 12:14:47-12:15:08. Trooper Show recalls this statement as "significant" because it illustrated

"compartmentalization," which is when drug traffickers are not told the exact address of where

they are supposed to go until they get close, so that if they are stopped, they cannot inform

investigators about the destination. Police Report at 6. Trooper Show then asked if Ms. Chavez

knew anything about more where they would meet her sister, and Ms. Chavez replied that they

would probably meet in a parking lot of a fast-food restaurant. Bodycam Footage at 12:15:02-

12:15:08. Trooper Show found these statements "severely problematic . . . because there is no

conceivable reason to compartmentalize a location such as a fast-food parking lot other than to conceal clandestine criminal acts" and because he had learned through his "experience in the field that bulk narcotics are often times dropped off and picked up in exactly that type of location." Police Report at 7. About this time, Trooper Show called for a cover unit. Bodycam Footage at 12:16:40-12:16:46. Ms. Chavez repeatedly told Trooper Show that she was not in possession of any illegal drugs other than marijuana. *See id.* at 12:16:11-12:16:16 (denying possession of fentanyl), 12:17:58-12:18:13 (denying possession of methamphetamine and heroin; verifying that there are "no drugs other than the weed" in the vehicle), 12:18:34-12:18:37 (denying possession of "bulk marijuana"). Trooper Show also asked Ms. Chavez for her consent to search the car, and she twice declined. *Id*. at 12:19:12-12:21:30.

After questioning Ms. Chavez, Trooper Show allowed her to return to the Kia and brought Mr. Acosta-Loya to the patrol car for questioning by saying, "Yo Frank," and "Come on man!" while gesturing to the patrol car. *Id.* at 12:25:20-12:26:00. Trooper Show asked if Mr. Acosta-Loya spoke English, and Mr. Acosta-Loya replied: "No . . . un poquito. Sí. Comprendo poquito. Pero no . . . no mucho" (no . . . a little. Yes. I understand a little. But not . . . not much.). *Id.* at 12:26:51-12:26:58. Although Trooper Show does not speak or understand Spanish well, and had called in another Trooper to translate, Trooper Show questioned Mr. Acosta-Loya in a combination of English and Spanish for almost 15 minutes without an interpreter. *See id.* at 12:26:51-12:39:14; ECF 52-3 ("Spanish Translation") at 1-15. Trooper Show told Mr. Acosta-Loya that he suspected him of having drugs and questioned Mr. Acosta-Loya's repeated denials. *Id*. at 12:31:06-12:32:04. Trooper Show testified that throughout their conversation, Mr. Acosta-Loya remained subservient and cooperative. Hearing Tr. 106:15-20.

About 12 minutes into the questioning, Trooper Show again asked Mr. Acosta-Loya if there were drugs in the Kia, and Mr. Acosta-Loya again denied there were. Bodycam Footage at 12:37:58-12:38:01. Trooper Show then asked Mr. Acosta-Loya in English for consent to search the Kia. *Id*. at 12:38:01-12:38:04. Mr. Acosta-Loya responded, "pero, uh, porque" (but, uh, why), and Trooper Show explained that he was asking because "I think you have drugs in your car." *Id.* at 12:38:04-12:38:12. Mr. Acosta-Loya said that he was driving more slowly because he had previously been ticketed for speeding and because he was in the process of changing lanes. *See* Spanish Translation at 14; *see also* Bodycam Footage at 12:38:12-12:38:28. Trooper Show responded that he was not going to write Mr. Acosta-Loya a ticket for impeding traffic, and that it was "no big deal." Bodycam Footage at 12:38:28-12:38:50. Trooper Show again told Mr. Acosta-Loya that he suspected that he was transporting bulk narcotics, and asked in English for consent to search the Kia. *Id.* at 12:38:50-12:39:10. Mr. Acosta-Loya responded that he did not understand. *Id.* at 12:39:11-12:39:13.

At this point, Trooper Show again tried to contact an interpreter. Trooper Show contacted Trooper Scott Severson, who speaks Spanish and began interpreting over the telephone.[4] Trooper Severson asked Mr. Acosta-Loya in Spanish if there was anything illegal in the Kia other than a user's amount of marijuana, and Mr. Acosta-Loya denied it. Spanish Translation at 16-18. Through Trooper Severson, Trooper Show asked Mr. Acosta-Loya if everything in the Kia belongs to him; told him that Trooper Show is a "task force officer with the DEA" who specializes in seizing bulk narcotics; suggested that if Mr. Acosta-Loya were in possession of bulk narcotics, they were likely someone else's drugs; and explained that it would be more

---

[4] For the entire interaction between Trooper Show, Trooper Severson, and Mr. Acosta-Loya, see Bodycam Footage at 12:40:10-12:50:42.

difficult for Mr. Acosta-Loya later to argue that they were someone else's drugs if he currently maintained that everything in the Kia was his. *Id.* at 16-19. Eventually, Mr. Acosta-Loya agreed that "it could be" that someone else had put a package in the Kia, and Mr. Acosta-Loya then made other incriminating statements about fentanyl being in the Kia. *Id.* at 19. For example, Trooper Severson asked Mr. Acosta-Loya in Spanish if Mr. Acosta-Loya knew if the fentanyl was in powder form, and Mr. Acosta-Loya responded that he thought so but did not know with certainty. *Id.* at 22. After those admissions, Trooper Show asked Trooper Severson to advise Mr. Acosta-Loya of his *Miranda* rights, saying: "[A]ctually, real quick, Scott, since I'm pretty sure he's admitting that he got loaded on his way here, will you tell him what his *Miranda* rights are?" *Id.* at 22 (cleaned up). Trooper Severson advised Mr. Acosta-Loya of his *Miranda* rights in Spanish at 12:50 p.m., almost 25 minutes after Trooper Show began questioning Mr. Acosta-Loya. *Id.* at 23-24. The Troopers never asked Mr. Acosta-Loya if he waived his rights or was willing to talk to the Troopers. *See id*; *see also* Bodycam Footage at 12:50:42.

After advising Mr. Acosta-Loya of his *Miranda* rights, Trooper Show asked for consent to search the Kia, which Trooper Severson translated as "consento para hacer un reviso."[5] Spanish Translation at 25; *see also* Bodycam Footage at 12:51:32-12:51:58. Mr. Acosta-Loya asked what Trooper Severson meant, and Trooper Severson's interpreted Mr. Acosta-Loya's ultimate response as giving consent.[6] Spanish Translation at 25. Trooper Show thanked Mr. Acosta-Loya for his honesty and asked him to get out of the patrol car and wait with Trooper Smith, who had recently arrived after being delayed to attend to a burning vehicle on the

---

[5] The word "consento" does not exist in Spanish.

[6] Mr. Acosta-Loya disputes the validity of his purported consent. The Court agrees that there was no valid consent to search given.

highway. *Id.* at 26; Hearing Tr. at 138:8-23. Trooper Show got out of his patrol car and walked to Mr. Acosta-Loya's car.

As Trooper Show walked to the Kia, Ms. Chavez approached Trooper Show and began to ask him about her right to remain silent. Trooper Show then advised Ms. Chavez of her *Miranda* rights. Bodycam Footage at 12:54:00-12:54:26. Trooper Show testified that although he had "information anyways from our interviews," "out of deference for [Ms. Chavez's] denied consent or whatever else," he would first deploy a narcotics canine around the car. *Id.* at 12:55:10-12:55:30.[7] When the Troopers were preparing to deploy the canine, Mr. Acosta-Loya and Ms. Chavez began speaking, and Ms. Chavez told Trooper Show that Mr. Acosta-Loya had said that he did not have a proper translator during the conversation and did not know that he was consenting to a search. *Id.* at 12:55:30-12:55:47, 12:56:16-12:56:36. Trooper Show handcuffed Ms. Chavez and placed her in the back of his patrol car and separated her from Mr. Acosta-Loya. *Id.* at 12:55:48-12:56:15. While Trooper Show was talking to Ms. Chavez and Mr. Acosta-Loya, Trooper Smith deployed the canine, who alerted. *See id.* at 12:58:29-12:58:31. Trooper Show then searched the Kia and found two packaged kilograms of fentanyl in the backseat inside a reusable grocery bag. *Id.* at 12:59:20-13:03:30.

## DISCUSSION

Defendants argue that the fentanyl seized from the Kia and Defendants' statements to Trooper Show should be suppressed for three reasons. First, Defendants argue that Trooper Show stopped the Kia without reasonable suspicion of a traffic or criminal violation. Second, Defendants contend that Trooper Show unlawfully prolonged the stop to investigate drug

---

[7] The canine was trained to alert to methamphetamine, cocaine, heroin, and fentanyl, ECF 52-2 at 12:55:20-12:55:32, and would not alert to marijuana.

trafficking without reasonable suspicion of a crime. Third, Defendants assert that their statements were made without them being informed of their *Miranda* rights, were involuntary, and were the fruit of an unlawful arrest. The Court addresses each argument in turn.

## A. Whether the Stop Was Unlawful

An officer may make an investigatory stop of a vehicle if "the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks omitted); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). Such criminal activity includes a traffic violation. *See United States v. Miranda-Guerena,* 445 F.3d 1233, 1236 (9th Cir. 2006) ("An investigatory stop of a vehicle is reasonable under the Fourth Amendment if the officer reasonably suspects that a traffic violation has occurred.").

"Reasonable suspicion is formed by 'specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" *United States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002) (quoting *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000)); *see also United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc) (holding that reasonable suspicion "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion" (emphasis in original)); *Terry v. Ohio*, 392 U.S. 1, 21 n. 18 (1968) ("This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence.").

The Court must determine reasonable suspicion based on the totality of the circumstances, *Arvizu,* 534 U.S. at 273, considering both the content and the reliability of the

information that the government possessed at the time, *see Navarette v. California*, 572 U.S. 393, 397-98 (2014) (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). The subjective intention of the officer generally is irrelevant to a Fourth Amendment analysis of reasonable suspicion. *Whren v. United States*, 517 U.S. 806, 813 (1996); *see also United States v. Thomas*, 211 F.3d 1186, 1191 (9th Cir. 2000) (explaining that reasonable suspicion must be "more than the mere subjective impressions of a particular officer" (quotation marks omitted)); *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

On a motion to suppress challenging the legitimacy of an investigatory stop, the government has the "burden of production [to] come[e] forward with specific and articulable facts to support [the officer's] suspicion of illegal activity." *United States v. Willis*, 431 F.3d 709, 715 n.5 (9th Cir. 2005) (quotation marks and citation omitted). The defendant then has the burden of proof and must introduce contrary evidence. *See id.* A traffic stop that is not supported by reasonable suspicion of criminal activity violates the Fourth Amendment, and "the evidence gathered as a result of the unconstitutional stop must be suppressed." *Lopez-Soto*, 205 F.3d at 1106.

Defendants argue that Trooper Show unlawfully stopped the Kia. Defendants contend that Trooper Show lacked reasonable suspicion that Defendants committed a traffic or criminal violation at the time of the stop. The government originally responded that Trooper Show had reasonable suspicion of a traffic violation. The government then filed a supplemental response arguing that Trooper Show also had reasonable suspicion that Defendants were engaged in drug-trafficking and could lawfully stop the Kia on that basis as well. Defendants reply that Trooper Show lacked reasonable suspicion to believe that they were engaged in drug-trafficking at the time that he made the stop.

For the reasons detailed below, the Court finds that Trooper Show did not have reasonable suspicion that Defendants had committed a traffic violation but did have reasonable suspicion that Defendants were engaged in drug trafficking, thereby allowing him lawfully to conduct the stop.

### 1. Traffic Violation

In Trooper Show's report, he stated that Mr. Acosta-Loya was impeding traffic and was required to stay in the furthest right lane under Oregon Revised Statutes ("ORS") § 811.130. "A person commits the offense of impeding traffic if the person drives a motor vehicle or a combination of motor vehicles in a manner that impedes or blocks the normal and reasonable movement of traffic." ORS § 811.130(1). Oregon law also sets forth the offense of "failure of a slow driver to drive on the right if the person is operating a vehicle upon a roadway at less than the normal speed of traffic at the time and place and under the conditions then existing and the person fails to drive" either in the right-hand lane or as close as practicable to the right-hand curb or edge of the roadway. ORS § 811.315(1). Neither of these statutes define the normal speed of traffic, and they do not state that driving below the speed limit is necessarily less than the normal speed of traffic.

Although the dash-cam footage does not show the Kia violating either of these statutes— it was traveling the same speed as the vehicle in front of it and was not blocking traffic—Trooper Show credibly testified that a small number of cars were backing up behind the Kia before the dash-cam footage begins. There are many factors, however, that counsel against a finding that Trooper Show had reasonable suspicion of a traffic violation. First, 61 miles per hour was not meaningfully less than the 65 miles-per-hour speed limit at that section of I-5. *Compare State v. Tiffin*, 202 Or. App. 199, 201, 205-206 (2005) (traveling at 28 to 30 miles per hour in a 40 mile-per-hour zone does not impede the "normal and reasonable movement of traffic" for purposes of

§ 811.130), *with State v. Potter*, 185 Or. App. 81, 83-84, 87 (2002) (affirming the conviction of a bicyclist who stopped his bike in the traffic lane of the Hawthorne Bridge in Portland, thereby impeding traffic); *see also United States v. Martinez-Beltran*, 2019 WL 1170773, at *2 (D. Ariz. Feb. 20, 2019) ("There is no statutory definition of 'normal speed of traffic.' . . . Because driving below the speed limit is not a statutory violation, that did not provide reasonable suspicion to believe the statute had been violated."). Though there is no statutory or caselaw definition of a "normal speed of traffic," the Kia's speed is more in line with the car in *Tiffin* than the bicyclist in *Potter*.

Second, even if 61 miles per hour were below the "normal speed of traffic," only "two or three" vehicles were behind the Kia. Moreover, given that he first encountered the Kia around milepost 263 or 264 and pulled it over around milepost 265, Trooper Show had no way of knowing whether the cars behind the Kia had just begun to accumulate or if they had been there for some time. This is especially pertinent given that Trooper Show acknowledges that the Kia slowed down in direct response to his presence. The Kia might well have been traveling at the normal speed of traffic before seeing Trooper Show, and a driver deserves some reasonable time to adjust to any changes in that norm.

Finally, Trooper Show described the Kia moving out of the lefthand lane shortly after his arrival, thereby removing any impediment that may have existed to the normal flow of traffic. Put simply, to find that Trooper Show had reasonable suspicion of a traffic violation, when the car in question was driving just under the speed limit for a brief time and promptly took steps to mitigate any effect of its slower speed, would cast a shadow on the reasonable and lawful driving habits of many drivers. Thus, the Court finds that Trooper Show did not have reasonable suspicion of a traffic violation when he stopped the Kia.

## 2. Drug-Trafficking

Turning to the suspicion of drug-trafficking, the government lists five facts known to Trooper Show at the time he stopped the Kia and argues that these facts are sufficient to establish reasonable suspicion. The factors are:

> (1) The Kia was an older model with new registration, which [Trooper Show] knew from his training and experience was a common trait of vehicles used to traffic drugs;
>
> (2) The Kia had a registered address in Antioch, California, which [Trooper Show] knew from his training and experience was a major fentanyl source for the Pacific Northwest;
>
> (3) The Kia was registered to two occupants, a male and female;
>
> (4) The female registrant was a target in an active DEA investigation in Colorado Springs, Colorado; [and]
>
> (5) The Kia was traveling northbound on Interstate-5, which [Trooper Show] knew from his training and experience is a common driving route that couriers use to transport fentanyl from warehousing hubs in the Bay Area to Oregon . . . .

ECF 68 at 3.

These factors are "specific articulable facts." *Lopez-Soto*, 205 F.3d at 1105. Defendants argue that factors 1, 2, 3, and 5 "are plainly insufficient to establish reasonable suspicion," ECF 79 at 14, because they "'rely solely on generalizations that, if accepted, would cast suspicion on large sections of the law[-]abiding population.'" *Id.* at 15 (quoting *United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006) (alteration in ECF 79)). *See also Reid v. Georgia*, 448 U.S. 438, 441 (1980); *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1127 (9th Cir. 2002); *United States v. Rodriguez*, 976 F.2d 592, 595-96 (9th Cir. 1992); *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000).

### a.  Factors 2, 3, and 5

With respect to factors 2, 3, and 5, the Court generally agrees with Defendants'
conclusion. Their city of origin set off alarm bells for Trooper Show because it was in the San
Francisco Bay area, but that is a region home to millions of Americans. Also, many married
couples jointly register their cars. Further, thousands of people drive on I-5 every day. Even
taken together, without more, these three factors establish a universe of suspicion that
encompasses "large sections of the law-abiding population." *Manzo-Jurado*, 457 F.3d at 935.
Thus, these factors, without more, do not provide reasonable suspicion under the Fourth
Amendment. But there is more.

### b.  Factor 1

Defendants too easily dismiss the importance of factor 1—the recent registration of
Defendants' older car. The government contends that this characteristic is common among drug
traffickers because it enables them to complicate investigative efforts to link drug traffickers to
any specific vehicle. In response, Defendants point out that California registers roughly 34.4
million used cars every year. Considering this fact, factor 1 would seem to cast the same
impermissibly broad shadow of suspicion as factors 2, 3, and 5. But the problem is not only the
recent registration; it is the recent license plate. In most private sales of a car, the license plate
typically transfers with the car, even if the registration does not. This, however, was not the case
here. Defendants procured new license plates for their older Kia. Indeed, it was in part the new
plate that initially aroused Trooper Smith's suspicion, with the "9" at the beginning of the plate
number alerting him to the fact of the recent California registration. This act—the change of
license plate and registration—places Defendants in a much narrower swath of the population.
As a result, this factor carries some weight for purposes of a reasonable suspicion analysis. Of

course, as even Trooper Show acknowledged, "it takes more than that" to establish reasonable suspicion. ECF 79 at 17 (quoting Hearing Tr. at 72:2-5). And, again, here there was more.

### c.  Factor 4

The law enforcement analyst learned of a link between Ms. Chavez's telephone number and an active DEA investigation proceeding in Colorado related to that number. Defendants argue that this information cannot be used to establish reasonable suspicion because: (1) the government has not established that Trooper Show had a requisite degree of certainty that the phone number in the database belonged to Ms. Chavez when he made the stop; (2) Trooper Show's testimony about the DEA investigation is "extremely vague"; (3) Trooper Show did not know who was present in the Kia when he initiated the stop; and (4) even granting that the evidence indicates that Ms. Chavez had trafficked narcotics in Colorado, it does not furnish grounds to suspect that she was engaged in drug trafficking at the time of her arrest in Oregon.

The Court finds Defendants' arguments unconvincing. On the first point, Defendants note that Trooper Show could not confirm whether he ever learned the percentage of likelihood of the phone number's accuracy, and that Trooper Show did not know the source or methodology underpinning that percentage. Indeed, Trooper Show testified that the phone database was not always 100 percent accurate. But Trooper Show relied on the expertise of his analyst who, as a matter of standard practice, shared only information with a percentage of likelihood of at least 60 percent, and usually more than 80 percent. It was, therefore, reasonable for Trooper Show to assume that the telephone number was more likely to be accurate than not. Moreover, reasonable suspicion depends not just on the reliability of the underlying information, but also its content. *Navarette*, 572 U.S. at 397. In this case, the content was limited but consequential—the phone number at issue was linked to a target of an ongoing DEA investigation, which strong suggests a connection to drug trafficking.

As to the vagueness of the information, Defendants state that Trooper Show's testimony did not include any description of when the DEA investigation began, how recently it had been active, or the nature of Ms. Chavez's phone's involvement. This is true. But the government need not know *every* relevant fact for the facts it *does* know to support reasonable suspicion of a crime. Such a requirement would defeat the purpose of the low standard under analysis here. Trooper Show knew that a telephone number more likely than not belonging to a registrant of the Kia was linked to the target of a DEA investigation for drug trafficking. In combination with other factors discussed above, this fact provides the basis for a finding of reasonable suspicion.

Third, Trooper Show did not need to know with certainty who was inside the Kia. The standard for reasonable suspicion allows for reliance on "reasonable inferences." *Lopez-Soto*, 205 F.3d at 1105. "[A]bsent other information, police may infer from the presence of a vehicle on the road that its registered owner is inside." *United States v. Nault*, 41 F.4th 1073, 1079 n.3 (9th Cir. 2022). Trooper Show had no such "other information," and thus it was reasonable for him to assume that Ms. Chavez would be inside the Kia.

Finally, Defendants' argument as to the relevance of the Colorado investigation to activity in Oregon falls flat. It stands to reason that an individual credibly suspected of engaging in an activity in location A may also carry out that activity in location B, especially if there is other indicia of that activity in location B. That logical leap would not furnish the grounds for probable cause, but reasonable suspicion is a low bar, factor 4 is a permissible part of the reasonable suspicion analysis.

Given these considerations, the Court concludes that factor 4 is important. In isolation, it might—but only might—not support a finding reasonable suspicion. But when combined with the other factors on which the government relies, especially factor 1, it yields a narrow profile

that does not encompass "large sections of the lawabiding population," *Manzo-Jurado*, 457 F.3d at 935, but rather "form[s] a basis for *particularized* suspicion," *Montero-Camargo*, 208 F.3d at 1129 (emphasis in original). Yes, thousands upon thousands of Bay area residents may drive north on I-5 on any given day, with a great many reaching Oregon. But how many of those residents have engaged in the uncommon practice of switching license plates upon the purchase of a used car? And how many are reliably connected to an active DEA investigation? Likely far fewer. These facts do not necessarily mean that a person is guilty or even furnish the basis for probable cause. But, under the totality of the circumstances, they are enough to support reasonable suspicion, and that is all that the Fourth Amendment requires to justify this stop. *See Arvizu,* 534 U.S. at 273 ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."). "Although each of a series of acts was 'perhaps innocent in itself . . . taken together they [warrant] further investigation.'" *Id.* at 274 (quoting *Terry*, 392 U.S. at 22). *See also United States v. Sokolow*, 490 U.S. 1, 9 (2021) (holding that factors that by themselves were "quite consistent with innocent travel" collectively amounted to reasonable suspicion). "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277.

**B.  Whether the Stop Was Unlawfully Prolonged**

The Court next turns to the issue of the traffic stop's length. If a stop is constitutionally valid at its inception, the next key questions are whether the stop was prolonged and, if so, whether the length was justified by reasonable suspicion based on the information available at the time. *United States v. Steiman*, 130 F.4th 693, 704 (9th Cir. 2025); *see also United States v.*

*Landeros*, 913 F.3d. 862, 867-88 (9th Cir. 2019); *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015).

In evaluating whether the stop was prolonged, the Supreme Court has given clear guidance. "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). The "[a]uthority for the seizure thus ends when tasks tied to the . . . infraction are—or reasonably should have been—completed." *Id* at 354; *see also Florida v. Royer*, 460 U.S. 491, 499 (1983) (holding that the scope of an investigative detention "must be carefully tailored to its underlying justification")

Trooper Show questioned Defendants for a cumulative period of roughly 40 minutes. This is certainly a prolongation beyond what a typical stop would require, and so the key question is whether the prolongation was independently supported by reasonable suspicion. The answer is yes.

In the first few minutes of the stop, Trooper Show learned the following: (1) that Mr. Acosta-Loya was carrying what reasonably appeared to Trooper Show to be a fraudulent identification document; (2) that Ms. Chavez carried an identification document from Colorado, the state in which her telephone number was associated with the target of a current DEA investigation; and (3) that the Kia—which had a California license plate—smelled of marijuana, indicating that it might have transported marijuana across state lines in violation of federal and state law. These facts, in combination with what Trooper Show knew before stopping the Kia, were sufficient to justify a 12-minute conversation with Ms. Chavez and a 25-minute conversation with Mr. Acosta-Loya, especially given the delay that the language barrier between Mr. Acosta-Loya and Trooper Show undoubtedly caused.

Moreover, neither occupant provided documentation that would have granted them legal driving privileges. Mr. Acosta-Loya, the driver, provided an international driver's license that, even if genuine and valid, was not enough to confer driving privileges without an accompanying state or national driver's license. Ms. Chavez provided a learner's permit that would have allowed her to drive only if Mr. Acosta-Loya had possessed a valid driver's license of his own, which he did not. This discovery furnished reasonable suspicion—and likely probable cause—of a violation of Oregon traffic laws. Time and again, courts have recognized that lack of a valid driver's license can give rise to reasonable suspicion of criminal activity and, depending on the circumstances, probable cause of a traffic violation. *See, e.g.*, *Lipton v. United States*, 348 F.2d 591, 594 (9th Cir. 1965); *United States v. Jackson*, 321 F. Supp. 1223, 1229 (D. Or. 2018); *United States v. Preston*, 685 F.3d 685, 690 (8th Cir. 2012); *United States v. Dix*, 2006 WL 314485 at *8 (E.D. Cal., Feb. 9, 2006). Thus, while Trooper Show *did* prolong the defendants' stop, the length of the stop was justified by reasonable suspicion.

## C.  Whether Defendants' *Miranda* Rights Were Violated

Defendants argue that Trooper Show interrogated them while they were in custody without informing them of their *Miranda* rights. In the government's response and supplemental response to the motion to suppress, the government does not argue that Defendants properly were informed of their *Miranda* rights.

The test for whether a person is in custody is whether "a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave." *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009) (quoting *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981)). In deciding this question, courts consider the following non-exclusive factors: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the

interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013) (quotation marks omitted).

The Court agrees that throughout the duration of the questioning, Defendants were in custody for purposes of the *Miranda* evaluation. Trooper Show used commanding language to summon Mr. Acosta-Loya to his patrol car. He probed both Defendants aggressively about their potential involvement with narcotics. Defendants were in the front seat of Trooper Show's patrol car, including some time with the door shut. Trooper Show testified that he did not inform Defendants that they were free to leave and emphasized that they were, in fact, not free to leave. Hearing Tr. 107:11-13, 117:1-6, 124:22. Moreover, Mr. Acosta-Loya was not a fluent English-speaker, which put him in the difficult position of being unable to effectively ask about his right to exit the patrol car.

As to interrogation, "[t]he term 'interrogation' means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.'" *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006) (quoting *Innis*, 446 U.S. at 301). An officer conducting a *Terry* stop may "ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions," *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984), but may not go beyond this general "on-the-scene" questioning without informing the suspect of their *Miranda* rights. Trooper Show's questioning here was not limited to a "moderate number of questions," but instead was extensive questioning that spanned more than 40 minutes and was intended to elicit incriminating responses. Thus, Trooper Show's questioning amounted to an interrogation.

The Court therefore finds that the Defendants were subjected to custodial interrogation and should have been advised of their *Miranda* rights before that interrogation began. They were not. Neither did they give any indication of an intent to waive their *Miranda* rights. As a result, the Court suppresses all statements that either Defendant made to Trooper Show before they were informed of their *Miranda* rights.

## D.  Whether There Was Probable Cause to Search the Car

The Government argues that Trooper Show had probable cause to search the Kia even without Defendants' statements because the narcotics canine alerted, citing the automobile exception. Defendants counter that although Trooper Show called for the dog early in the traffic stop, he made the decision to use the dog as a direct result of involuntary statements from Defendants, making it "fruit of the poisonous tree." *See, e.g.*, *United States v. Patane*, 542 U.S. 630, 644 (2004). The Court will evaluate the question of involuntary statements in the next section. That question is irrelevant to the use of the narcotics canine for reasons discussed in this section.

"Under the automobile exception to the warrant requirement, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime." *Scott*, 705 F.3d at 417. "Evidence from a trained and reliable handler about alert behavior he recognized in his dog can be the basis for probable cause." *United States v. Thomas*, 726 F.3d 1086, 1098 (9th Cir. 2013). Dog sniffs can be conducted so long as the traffic stop in not unlawfully prolonged. *Rodriguez*, 575 U.S. at 354-55; *see also Illinois v. Caballes*, 543 U.S. 405, 410 (2005) ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."). The discovery of contraband such as drugs through a foreseeable canine sniff can qualify as inevitable discovery. *See, e.g.*, *United States v.*

*Alden*, 50 F. App'x 869, 870 (9th Cir. 2002) (noting that officers would have found drugs from canine sniff around car); *United States v. Seward*, 68 F.3d 482 (9th Cir. 1995) (unpublished) (stating that a bag containing drugs would have nevertheless been subjected to canine sniff).

As discussed above, the traffic stop was not unlawfully prolonged, and Trooper Show was free to employ the dog whether or not he had pre-existing probable cause to believe that there were drugs in the Kia. *See Cabelles*, 543 U.S. at 408-10 (holding that when a dog sniff capable only of uncovering illegal narcotics is performed absent reasonable suspicion during an otherwise lawful traffic stop, that "intrusion on [a person's] privacy expectations does not rise to the level of a constitutionally cognizable infringement."). Because the dog alerted, Trooper Show then gained probable cause to believe that the Kia contained contraband and evidence related to the unlawful importation of narcotics. Contrary to Defendants' arguments, the government has shown by a preponderance of the evidence that Trooper Show would have deployed the narcotics canine regardless of Mr. Acosta-Loya's statements. The primary basis of this showing is timing: Trooper Show summoned the canine before his interrogation of Defendants. Thus, his search of the Kia was lawful.

### E.  Whether the Fentanyl Would Have Been Inevitably Discovered

Defendants argue that Mr. Acosta-Loya's statements to Trooper Show were involuntary and the fruit of an unlawful arrest. If that were true, then not only would that serve as an additional basis for suppression of the statements but would also require the suppression of any physical evidence derived from those statements. *See Patane*, 542 U.S. at 639-40; *Brown v. Illinois*, 422 U.S. 590, 602 (1975).

But the Court need not reach these questions. Because Trooper Show conducted an un-*Mirandized* interrogation of Defendants, those statements are already suppressed. And even if Defendants' arguments as to involuntary statements and unlawful arrest are correct, the physical

evidence would remain admissible under the Inevitable Discovery Rule, which permits the admission of otherwise excludable evidence "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police." *Nix*, 467 U.S. at 447; *see also United States v. Hylton*, 30 F.4th 842, 848 (9th Cir. 2022) (noting that this doctrine is applicable when it is apparent that, through the execution of routine procedures, the evidence in question would have been unveiled). The government need make this showing only by a preponderance of the evidence. *See Nix*, 467 U.S. at 444.

Defendants contend that this doctrine is not applicable here because, despite the fact that Trooper Smith was en route with his narcotics canine before Trooper Show spoke to Mr. Acosta-Loya, his decision to deploy the canine was influenced by Mr. Acosta-Loya's confession. This is not a credible argument. Why would a law enforcement officer call for a drug-sniffing dog without intending to use it, and why would a dog handler go to the trouble of bringing the dog without expectation that it would be used? Additionally, Trooper Show was clearly suspicious that the Defendants were trafficking drugs before hearing Mr. Acosta-Loya's confession. He expressed skepticism of Mr. Acosta-Loya's international driver's license, asked Ms. Chavez for consent to search the vehicle, and even told Mr. Acosta-Loya that he suspected him of transporting drugs. The government's contention that Trooper Show planned to use the dog before Mr. Acosta-Loya confessed is credible. With use of the dog, Trooper Show would inevitably have discovered the fentanyl in the Defendants' car regardless of what Mr. Acosta-Loya said, so the Inevitable Discovery Rule applies.

## CONCLUSION

The Court GRANTS IN PART AND DENIES IN PART Defendants' Motions to Suppress, ECF 52 (Motion filed by Defendant Frank Acosta-Loya) and ECF 56 (Motion filed by Defendant Brianda Chavez).

**IT IS SO ORDERED**.

DATED this 16th day of October, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge